USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___7/7/2023___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

      -against-

PHYO HEIN HTUT,

               Defendant.

No. 22-CR-671 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

      The Government charged Defendant Phyo Hein Htut ("Defendant") with one count of conspiracy to assault a foreign official in violation of 18 U.S.C. § 112(a), through an indictment filed by the Government on December 5, 2022 (ECF No. 26). The Government filed a Superseding Indictment (S1) on May 2, 2023. (ECF No. 41.) The Superseding Indictment (S1) adds charges for false statements in violation of 18 U.S.C. § 1001(a)(2).[1]

## BACKGROUND

      The following facts are drawn from the criminal complaint filed in this matter (Complaint ("Compl."), ECF No. 1) and the Superseding Indictment (ECF No. 41).

      In February 2021, the Burmese military overthrew Myanmar's elected civilian government. (Compl. ¶ 5.a.) The Myanmar Permanent Representative to the United States (the "Ambassador") represents Myanmar's now-deposed civilian government, and the Burmese military has proven unsuccessful in its attempts to remove the Ambassador from his position. (*Id.*) Following the coup, an arms dealer in Thailand who sold weapons to the Burmese military ("CC-1"), asked Defendant to hire a hitman to injure or kill the Ambassador. (*Id.* at ¶¶ 5.c–d; ECF No. 35 at 3.) Defendant and CC-1 allegedly agreed on a plan to hire others to tamper with the tires on

---

[1] The Superseding Indictment (S1) includes the same count for conspiracy charged in the original Indictment. As of the date of this Opinion & Order, Defendant has not been arraigned on the Superseding Indictment (S1).

the Ambassador's car, thus likely causing a crash and resulting in injury to the Ambassador. (*Id.* at ¶ 5.d.) To that end, on July 22 and July 23, 2021, Defendant received two separate transfers of approximately $2,000 from CC-1 through an intermediary, CC-4.[2] (*Id.* at ¶ 5.e.)

Defendant was charged with one count of conspiracy to assault a foreign official. (ECF No. 26.) Defendant allegedly participated in the conspiracy with the intent to "assault" the Ambassador, and he took overt actions to carry out the conspiracy, including (1) communicating by cellphone and FaceTime with CC-1 regarding the interior design of the Permanent Mission of the Republic of the Union of Myanmar to the United Nations, where the Ambassador worked, in New York, New York (the "Embassy"), and (2) receiving two transfers of $2,000, from CC-4 on behalf of CC-1, as an advance payment for the attack on the Ambassador. (*Id.* at ¶¶ 2–3.)

The Government filed a Superseding Indictment (S1) on May 2, 2023. (ECF No. 41.) The Superseding Indictment (S1) adds charges for false statements in violation of 18 U.S.C. § 1001(a)(2). Defendant allegedly lied during a July 12, 2022 proffer session with the Government, when he "falsely told" a special agent of the Federal Bureau of Investigation ("FBI") that (a) Defendant "was asleep when he received a Facetime call from CC-1 on or about June 29, 2021"; (b) Defendant "answered the call without knowing that CC-1 was calling"; and (3) Defendant "then provided CC-1 an impromptu tour of the inside" of the Embassy. (*Id.* at ¶ 4.) Defendant also allegedly lied during a July 27, 2022 proffer session with the Government, when he "falsely stated" to an FBI agent that "immediately after discussing a plan with CC-1 on or about June 29, 2021 to hurt the Ambassador, [Defendant] engaged in specifically described repeated efforts to

---

[2] For the sake of clarity, the Court refers to the co-conspirators as they are described in the moving papers. (*See generally* Government Memorandum in Support of Government's Motions *in Limine* ("Gov't Mem."), ECF No. 45; Defendant Memorandum of Law in Opposition to Government's Motions *in Limine* ("Def. Opp."), ECF No. 48; Government Memorandum of Law in Further Support of Government's Motions *in Limine* ("Gov't Reply"), ECF No. 50.) CC-4 is referred to as CC-2 in the Complaint at ECF No. 1.

notify two individuals working at the [Embassy]," (the "Supervisor" and the "Security Chief"), "about the plan to harm the Ambassador."  (*Id.* at ¶ 5.)

Defendant now moves to sever the conspiracy count from the false statement counts.  (ECF No. 46.)  The Government also submits a number of motions *in limine*.  (ECF No. 45.)  For the reasons set forth below, the Court GRANTS Defendant's motion to sever and GRANTS in part and DENIES in part the Government's motions *in limine*.

## LEGAL STANDARDS

### I.    Severance

Under Rule 14(a) of the Federal Rules of Criminal Procedure, courts may "order separate trials of counts" in cases where "the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant or the government."[3]  To demonstrate that severance is proper, a defendant must establish substantial prejudice.  *See United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991) ("The defendant must establish prejudice so great as to deny [defendant] a fair trial.").  "Substantial prejudice does not simply mean a better chance of acquittal." *United States v. Potamitis*, 739 F.2d 784, 790 (2d Cir. 1984), *cert. denied*, 469 U.S. 934 (1984).  Indeed, "[g]ranting separate trials under Rule 14 simply on a showing of some adverse effect, particularly solely the adverse effect of being tried for two crimes rather than one, would reject the balance struck by Rule 8(a)." *United States v. Werner*, 620 F.2d 922, 929 (2d Cir. 1980).  Rather, the prejudice of a joint trial must constitute a "miscarriage of justice."  *United States v. Miller*, 116 F.3d 641, 679 (2d Cir. 1997) (quoting *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993)).  And "[e]ven in those rare instances where a defendant establishes a 'high' risk of prejudice, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'"  *United States v. Felder*,

---

[3] Defendant does not appear to contest proper joinder under Rule 8 of the Federal Rules of Criminal Procedure.  Defendant instead focuses on whether the Court ought to sever the counts to avoid prejudice to Defendant.

No. S2 14 Cr. 546 (CM), 2016 WL 1659145, at *4 (S.D.N.Y. Apr. 22, 2016) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

"Courts have recognized that '[p]rejudice may develop when an accused wishes to testify on one but not the other of two joined offenses which are clearly distinct in time, place and evidence." *United States v. Sampson*, 385 F.3d 183, 190–91 (2d Cir. 2004) (quoting *Cross v. United States*, 335 F.2d 987, 989 (D.C. Cir. 1964)). However, "a mere unexplained assertion of this sort is not enough." *Werner*, 620 F.2d at 930. Instead, the defendant must make "a convincing showing that he has both important testimony to give concerning one count and a strong need to refrain from testifying on the other." *Sampson*, 385 F.3d at 191 (internal citation omitted). Such a showing requires that "the defendant present enough information—regarding the nature of the testimony he wishes to give . . . and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine." *United States v. Ezeobi*, No. 10 Cr. 669 (DLC), 2011 WL 3625662, at *3 (S.D.N.Y. Aug. 17, 2011).

The fact that evidence of the crime charged in one count may be admissible in the Government's direct case in the trial of the other will typically defeat the need to sever the counts. *See United States v. Salemo*, 499 F. App'x 110, 114 (2d Cir. 2012) (citing *United States v. Halper*, 590 F.2d 422, 431 (2d Cir. 1978)); *United States v. Broccolo*, 797 F. Supp. 1185, 1192 (S.D.N.Y. 1992). And even where prejudice is established, a court must still "weigh the considerations of 'economy and expedition in judicial administration' against the defendant's interest in having a free choice with respect to testifying." *Sampson*, 385 F.3d at 191 (quoting *Baker v. United States*, 401 F.2d 958, 977 (D.C. Cir. 1968)).

## II.    Motions *in Limine*

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176–77 (S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)).  An *in limine* motion is intended "to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996).  "[C]ourts considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context." *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 165 (S.D.N.Y. 2006).  "Because a ruling on a motion *in limine* is 'subject to change as the case unfolds,' this ruling constitutes a preliminary determination in preparation for trial." *United States v. Perez*, No. 09-CR-1153 (MEA), 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011) (quoting *Palmieri*, 88 F.3d at 139).

## DISCUSSION

### I.  Defendant's Motion to Sever

Defendant moves to sever the false statement counts added in the Superseding Indictment from the conspiracy count set forth in the original Indictment.  (ECF No. 45.)  Defendant argues a joint trial on all counts will prejudice the Defendant in a number of ways.  (Defendant Memorandum of Law in Support of Defendant's Motion to Sever ("Def. Mem."), ECF No. 45.) First, Defendant argues the joint trial will result in jury confusion, as Defendant will need to "elicit considerable proof about other, related statements made during the proffer sessions" to "contest whether the alleged misstatements were intentionally misleading and whether they were material." (*Id.* at 5–6.)  In effect, trying the false statement counts will result in a mini-trial, forcing Defendant to "elicit proof as to the purpose of the proffer sessions, the nature of the proffer agreement, and

any instructions that were or were not given to [Defendant] before or during these proffer sessions." (*Id.* at 6.) Second, Defendant notes the possibility that defense counsel James Neuman may feel compelled to testify should the Government witness's recollection of the proffer differ in any material respect from that of defense counsel. (*Id.* at 6–8.) Third, a joint trial will force Defendant to testify as to both counts, even though Defendant has a "compelling need" to testify to *only* the false statement charges. (*Id.* at 8–9.) Whereas Defendant needs "to explain [his] understanding of the [proffer] questions and his intentions in making [the allegedly false] statements" (*id.* at 8–9), Defendant does not want to testify to the conspiracy charge and therein risk "open[ing] the door to the admission of numerous other statements made during the course of the four lengthy proffer sessions" (*id.* at 9). Lastly, although the parties' proffer agreement allows the Government to offer evidence of statements made during a proffer session in a prosecution for false statements, Defendant argues the proffer agreement does not address whether the Government can offer that same evidence when a false statement charge is joined with other charges. (*Id.* at 10–11.) In the absence of such clarity, argues Defendant, the Court should interpret the proffer agreement strictly against the Government and sever the false statement counts from the underlying conspiracy count. (*Id.* at 11.)

The Government opposes Defendant's motion to sever. (*See generally* Government Memorandum of Law in Opposition to Defendant's Motion to Sever ("Gov't Opp."), ECF No. 49.) First, the Government argues the issues in the joint trial are "straightforward" and do not risk confusing the jury: for example, whereas Defendant agreed in advance to a video call with CC-1 to show CC-1 the inside of the Embassy, the Government intends to show Defendant lied in his proffer about the same call, saying instead that he gave CC-1 an "impromptu" tour after unknowingly answering CC-1's phone call. (*Id.* at 4–5.) The Government argues the two false

statement counts involve "narrow and well-defined" topics and do not require the introduction of other topics ("such as the defendant's background, his emigration to the United States, and his involvement in protests") to "contextualize or explain" the allegedly false statements.  (*Id.* at 5.) Second, the Government observes the possibility of defense counsel testifying is "speculative" as Defendant has not identified "any known inconsistency about which [defense counsel] is likely to testify."  (*Id.* at 8.)  Should defense counsel be forced to testify, the Government suggests co-counsel, Richard Palma, should try the case.  (*Id.* at 8.)  Third, the Government maintains Defendant has failed to articulate a compelling need for him to either testify on the false statement counts or remain silent on the conspiracy count.  (*Id.* at 9–10.)  And fourth, the Government argues false statements made during a proffer are admissible at trial on a multi-count indictment where the charges include one for false statements.  (*Id.* at 11.)  The Government asserts "[t]here is no basis to conclude that by agreeing to the admissibility of proffer statements in false statement prosecutions the Government also silently committed to bring such prosecutions as standalone trials."  (*Id.* at 11–12.)

Defendant's motion presents a close call.  On the one hand, it is clear from the face of the proffer agreement that the Government may offer evidence of false statements made during a proffer session in a prosecution for false statements.  (*See* Proffer Agreement, ECF No. 46-3 at ¶ 2.)  Defendant argues "the proffer agreement does not clearly encompass the scenario where the government seeks to join false statement charges—based upon proffer statements —with the prior charges that were the very subject of those proffer statements." (Defendant Memorandum of Law in Further Support of Defendant's Motion to Sever ("Def. Reply"), ECF No. 51 at 7.)  Adopting Defendant's argument, however, requires a formulaic, overly-restrictive interpretation of the word, "prosecution."  *See, e.g., United States v. DeJesus*, No. 17-CR-370 (VEC), 2017 WL 3738783, at

*3 (S.D.N.Y. Aug. 30, 2017) (describing case involving multiple counts, including for false statements, as "a prosecution for false statements under 18 U.S.C. § 1001"); *United States v. Ferrarini*, 9 F. Supp. 2d 284, 299 (S.D.N.Y. 1998) (describing case involving dozens of counts, including for false statements, as a "Section 1001 prosecution for false statements" even though the false statements were obtained in a proffer related to the conspiracy charged in the indictment). Moreover, the Government is also correct that (1) meeting its burden in its case-in-chief on the false statement counts requires relatively straight-forward evidence (Gov't Opp. at 4–5) and (2) the possibility of defense counsel testifying is "speculative" at best (*id.* at 8).

On the other hand, a joint trial threatens more than mere prejudice to Defendant. At the outset, the Government characterizes the false statement counts as encompassing "narrow and well-defined" topics, both of which involve Defendant lying to minimize his role in the underlying conspiracy. (*Id.* at 5.) As such, the Government believes no other statements from the proffer sessions are necessary to "contextualize or explain" the alleged false statements. (*Id.*) For example, take count two. The Government alleges Defendant admitted to the FBI that he planned in advance to show CC-1 a tour of the Embassy (Gov't Mem. at 11), thus proving Defendant lied when he said during his proffer session that he gave CC-1 an impromptu tour of the facility (Gov't Opp. at 4–5). The Government presents its case in a consequential manner: *if* Defendant told the FBI that he planned in advance to show CC-1 a tour of the Embassy, *then* Defendant must have lied when he said the tour on June 29, 2021 was "impromptu."

But evidence of Defendant's other statements at the proffer session may confound the Government's theory. If, as Defendant repeatedly told the Government at his proffer, he feigned participation in the conspiracy through a long series of calls and messages with CC-1 leading up to June 29, 2021 (Def. Reply at 1–2), then it is possible he could have feigned an agreement with

CC-1 to show him the Embassy at some point (as Defendant allegedly told the FBI) and still have provided CC-1 an "impromptu tour" on June 29, 2021 (as Defendant allegedly told the Government during a proffer session).  In other words, a jury could find both statements are true: because Defendant was feigning participation in the conspiracy, (1) Defendant agreed in advance to provide a tour to CC-1; and (2) Defendant ultimately provided an "impromptu tour" because CC-1 unexpectedly awoke him with a phone call during Defendant's shift at the Embassy.  In addition, apparently no record exists of the precise questions asked to Defendant during the proffer sessions (Def. Mem. at 5), and Defendant has repeatedly reported that he has difficulty understanding the English language (*id.* at 6).  In sum, additional context from the proffer sessions may be necessary for Defendant to fairly rebut the Government's case.  And because it may be necessary for this Court to allow Defendant to "contextualize or explain" the isolated false statements with additional statements from the proffer, the false statement counts raise the prospect of a "mini-trial" over whether Defendant's alleged false statements were intentionally-misleading, material, or false in the context of four, hours-long proffer sessions.  Such a "mini-trial" would direct a disproportionate amount of the jury's focus to Defendant's credibility in interviews conducted a year after the alleged conspiracy, even though the Defendant's tendency to lie or tell the truth to the Government in July 2022 proffer sessions has no bearing on whether Defendant chose in June 2021 to participate in the charged conspiracy.

A joint trial also hamstrings Defendant's ability to proffer an adequate defense.  In a separate trial on the conspiracy count, the Government could not introduce evidence of statements made at a proffer session to prove its case unless Defendant opened the door by testifying or presenting arguments or evidence contradicting statements made during the proffer sessions.[4]  (*See*

---

[4] In a separate trial for false statements, the Government could use the same witnesses and evidence it used in the conspiracy trial to prove its case.  (Gov't Opp. at 4.)  For example, the Government could admit evidence of

Proffer Agreement at ¶ 3.)  *Cf. United States v. Hester*, No. S1 19-CR-324 (NSR), 2020 WL 3483702, at *22 (S.D.N.Y. June 26, 2020) (denying motion to sever in part because "evidence of the underlying crime would be admissible in a separate trial on the obstruction of justice charge, and vice versa.").  In light of these high stakes, Defendant would have a strong reason to forgo testifying in a trial on the charged conspiracy.  (Def. Mem. at 9 (testifying on the false statement counts "would require [Defendant] to testify about the original assault charges, and likely open the door to the admission of numerous other statements made during the course of the four lengthy proffer sessions").)  In a separate trial on the false statement counts, meanwhile, Defendant would deploy a different strategy.  Defendant would testify to "explain [his] understanding of the questions and his intentions in making the statements," or to "recall whether . . . particular questions were confusing or ambiguous to him, either because of the nature of the questions or the interpretations."  (Def. Reply at 6, 6 n.1.) This testimony would prove especially important given the unique circumstances here: (1) Defendant had little incentive to lie because he had previously told a "true" account of the June 29, 2021 tour to the Government in a confession to the FBI on August 4, 2021; (2) no written record exists of the questions posed to Defendant or his verbatim responses; and (3) Defendant has repeatedly reported to the Government that he has difficulty understanding the English language.  A joint trial would likely force Defendant to testify on *both* counts, undermining Defendant's strategy not to testify on the conspiracy count.

In addition, although the possibility of defense lead counsel James Neuman testifying is purely speculative, the late hour at which the Government filed its Superseding Indictment restricts the Court's options should the need arise for defense counsel to testify.  In the ordinary course of events, as the Government suggests, the Court could relieve Mr. Neuman of his representation of

---

Defendant's confession to the FBI in which Defendant stated he had planned in advance to give CC-1 a tour of the Embassy.

Defendant, allow him to testify, and substitute him for co-counsel Richard Palma (who did not attend any of the proffer sessions).  (*See* Gov't Opp. at 8.)  In the present circumstances, however, that option is a non-starter.  Mr. Palma has represented Defendant for far less time than Mr. Neuman, and substituting Mr. Neuman for Mr. Palma at this late hour would force Defendant into an untenable position on the eve of trial.

Standing alone, none of Defendant's stated reasons for severance—jury confusion, Defendant's right not to testify, or the possibility of defense counsel testimony—rise to the level of "substantial prejudice."  Viewed together, however, and in conjunction with the Government's decision to bring the false statement charges in a Superseding Indictment filed just two months before trial (and on the eve of pre-trial motions practice), the Court sees no choice but to grant Defendant's motion to sever out of an abundance of caution.  *See United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998) ("A defendant seeking severance must show that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials. . . . [Rule 14] leaves the type of relief granted to the sound discretion of the trial court."); *see also United States v. Presgraves*, 658 F. Supp. 2d 770, 785 (W.D. Va. 2009) (granting defendant's motion to sever "out of an abundance of caution").

Trial on the conspiracy count will proceed as scheduled, with jury selection beginning on July 11, 2023.  The Court will schedule trial on the false statement counts for a later date.

The Court now turns to address the Government's motions *in limine*.

## II.     Government's Motions *in Limine*

By its motions *in limine*, the Government asks the Court to rule as follows:

(1) "preclude the defendant from presenting a duress defense at trial unless and until he proffers evidence sufficient to support such a defense";

(2) "preclude the defendant from introducing his own self-serving hearsay statements";

(3) "admit evidence that the defendant communicated with co-conspirators about multiple well-known dissidents who were targets of the Myanmar military, as direct evidence of the defendant's participation in the charged conspiracy, or, alternatively, under Federal Rule of Evidence 404(b);

(4) "admit out-of-court statements made by the defendant's co-conspirators pursuant to Federal Rule of Evidence 801(d)(2)(E)"; and

(5) "preclude evidence or argument concerning punishment, the defendant's immigration status, or other personal factors unconnected to guilt."

(Gov't Mem. at 1.)  The Court addresses each motion in turn.

### A.  Duress

The Government requests this Court preclude Defendant from offering evidence or making an argument in support of a duress defense unless Defendant first "offers the requisite factual predicate" for the defense.  (*Id.* at 13.)  The Government argues Defendant is yet to provide such a factual predicate for the defense.  (*Id.* at 15.)  To the contrary, the Government contends that Defendant "had multiple alternatives to breaking the law—including contacting law enforcement and seeking assistance—available to him over an extended period of time."  (*Id.* at 15.)  Moreover, the Government asserts that Defendant's "subjective belief" that his family in Myanmar was in danger does not "excuse his failure to contact law enforcement officials in the United States."  (*Id.*

at 16.)  Given the "near impossibility" Defendant establishes the requisite elements for a duress defense, the Government requests Defendant first declare his factual predicates for the defense. (*Id.* at 16.)  To that end, the Government observes, courts in the Second Circuit "routinely review the basis for any duress defense before trial and, if appropriate, hold a pretrial hearing to determine whether there is sufficient evidence to submit the defense to the jury."  (*Id.* at 14–15.)

Defendant does not "dispute" that "where no evidence has been introduced to support a duress defense," the Court may "preclude counsel from presenting such an argument."  (Def. Opp. at 3.)  Moreover, Defendant concedes that, at times, "it may be appropriate for the defense to make a proffer on a duress defense prior to introducing testimony in support of that defense."  (*Id.* at 3.)  Defendant, however, disagrees that such a proffer must take place before trial.  Defendant also disagrees that the Government "is entitled to attend . . . whenever that proffer occurs."  (*Id.* at 3.)  To that end, Defendant explains that "in the event [Defendant] elect[s] to pursue a defense of duress," Defendant will "inform this Court of that fact, *ex parte*, prior to making such an argument to the jury or presenting any evidence in favor of that defense."  (*Id.* at 3.)  The Government responds that Defendant "cites no authority for the *ex parte* proffer he proposes," and the Government also argues the Court should preclude Defendant from introducing evidence or argument related to duress because Defendant still has not "attempt[ed] to make the necessary showing" or "offer[ed] . . . [a] compelling reason why resolution of this issue should be delayed until trial."  (Gov't Reply at 2.)

Duress is a legal excuse for a defendant's criminal conduct if, "at the time the conduct occurred, the defendant was subject to actual or threatened force of such a nature as to induce a well-founded fear of impending death or serious bodily harm from which there was no reasonable opportunity to escape other than by engaging in the unlawful activity."  *E.g., United States v.*

*Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990).  To merit a jury instruction on duress, a defendant must make a showing of the following elements: "(1) a threat of force directed at the time of the defendant's conduct; (2) a threat sufficient to induce a well-founded fear of impending death or serious bodily injury; and (3) a lack of a reasonable opportunity to escape harm other than by engaging in the illegal activity."  *United States v. Pestana*, 865 F. Supp. 2d 357, 361 (S.D.N.Y. 2011) (quoting *United States v. Gonzalez*, 407 F.3d 118, 122 (2d Cir. 2005)), *aff'd sub nom. United States v. Ortiz*, 525 F. App'x 41 (2d Cir. 2013) (summary order); *see United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) ("Upon a proper request, a defendant is entitled to a jury instruction on any defense theory for which there is a foundation in the evidence, . . . even if the trial court determines that the evidentiary foundation of the defense theory is only tenuous.").  Although a defendant need only establish a "foundation in the evidence," the Second Circuit recognizes that "it is appropriate for a court to hold a pretrial evidentiary hearing to determine whether a defense fails as a matter of law."  *Paul*, 110 F.3d at 871.  Should the Court hold such a hearing and find the defendant's evidence to be "insufficient as a matter of law to establish the defense," the Court is then "under no duty to give the requested jury charge or to allow the defendant to present the evidence to the jury."  *Id.*

Here, both parties agree Defendant is yet to make the necessary factual showing to entitle Defendant to present a duress defense.  The parties disagree as to how and when Defendant ought to make the necessary showing.  The Government asserts the time has passed for Defendant to make such a showing, and as such, the Government asks the Court to preclude Defendant from presenting evidence or arguments related to duress.  (Gov't Reply at 2.)  Defendant, meanwhile, intends to inform the Court if he chooses to pursue a duress defense, and he requests an *ex parte* hearing to make the requisite showing to the Court.  (Def. Opp. at 3.)  At this stage in the

proceedings, the Court is not ready to preclude Defendant from making a duress defense without first allowing Defendant a formal opportunity to make the requisite showing. *Cf. United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (observing that "evidentiary foundation of the defense theory" for duress need only be "tenuous," and acknowledging that it is sometimes "appropriate"—but not mandatory—for the Court to "hold a pretrial evidentiary hearing to determine whether a defense fails as a matter of law"). The Court does not agree with Defendant though that this showing must take place outside the presence of the Government. Defendant cites no authority to support its position. *Cf. United States v. Carpenter*, 923 F.3d 1172, 1179 (9th Cir. 2019) (finding lower court did not abuse discretion in denying sealing of pre-trial offer of proof where defendant did not offer "compelling reason" to do so). The Court grants the Government's motion to preclude Defendant from presenting evidence or arguments related to duress unless and until Defendant makes the requisite showing. To do so, Defendant shall inform this Court in writing twenty-four hours prior to jury selection that he intends to offer such evidence or argument, and the Court will conduct a hearing outside the presence of the jury to determine whether Defendant has made the requisite showing.

### B. Defendant's Prior Statements

The Government intends to offer, as part of its case-in-chief, statements made by Defendant during his (1) August 2 and 3, 2021 meetings with the Supervisor and the Security Chief; (ii) video-recorded August 4, 2021 FBI interview; (iii) July 12, 2022 proffer; and (iv) July 27, 2022 proffer. (Gov't Mem. at 17.) The Government anticipates that Defendant may try to offer other statements made by Defendant during those meetings: specifically, those statements tending to show Defendant "was acting out of fear in aiding CC-1." (Gov't Mem. at 17.) As such, the Government requests this Court preclude Defendant from introducing these self-serving hearsay

statements.  The Government argues that presenting "only a portion" of the Defendant's prior statements "do[es] not make the [D]efendant's other statements admissible." (*Id.* at 22.)  These additional statements are "not needed to provide context or a 'fair and impartial understanding' of any statement the Government may offer." (*Id.* at 22.)  Defendant's remedy, according to the Government, is to "take the stand and testify on his own behalf" and *not* "to elicit his exculpatory statements from other witnesses through inadmissible hearsay." (*Id.* at 22.)

Defendant argues that precluding the admission of additional statements would "hide from the jury the fact that [Defendant] repeatedly and consistently told others that he never intended to join the conspiracy," a result Defendant argues would "utterly distort the meaning of the statements the government apparently intends to introduce." (Def. Opp. at 4.)  Defendant appears to concede the statements are hearsay, but he contends they ought to be admitted pursuant to the "rule of completeness" because the hearsay statements are "necessary to explain the admitted portion." (*Id.* at 5.)  For example, the Government plans to offer statements Defendant made to the Supervisor and the Security Chief in which Defendant appears to confess to joining a conspiracy to assault the Ambassador. (Gov't Mem. at 17.)  But "[t]he real import" of Defendant's statements, according to Defendant, "was that he had feigned participation in the conspiracy, without ever intending to do anything to endanger the Ambassador." (Def. Opp. at 8.)  Defendant also suggests that he intends to "introduce the initial portions of the videotaped interview" with the FBI to "determine whether [Defendant's] statements were voluntary." (*Id.* at 9 n.2.)  The Government responds that the Government's introduction of Defendant's admissions regarding "*what* he did" does not "open[] the door to the various post-hoc explanations [Defendant] gave about *why* he did these things." (Gov't Reply at 5–6 (emphasis in original).)  In other words, "while the defendant's inculpatory admissions bear the hallmark of reliability that make them admissible as party

16

statements, his post-hoc exculpatory explanations—made days or weeks after the relevant conduct—bear no indicia of reliability and are classic excludable hearsay." (*Id.* at 6.)

Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Whereas hearsay statements are generally not admissible at trial, Fed. R. Evid. 802, a defendant's own statement—when offered against the defendant—is *not* hearsay, Fed. R. Evid. 801(d)(2)(A). When that same defendant, however, seeks to introduce their own prior statement for the truth of the matter asserted, that statement is hearsay and is inadmissible. *See, e.g., United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982). The hearsay rule applies, and a defendant still cannot offer their own prior statements *even if* the Government offers part of a defendant's statement against that defendant—which again, is non-hearsay and is admissible, Fed. R. Evid. 801(d)(2)(A). Nonetheless, a defendant may still offer their prior statement—in addition to the portion offered by the Government—under the rule of completeness.

The rule of completeness, as reflected in Federal Rule of Evidence 106, states as follows: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." The rule extends to oral testimony as well. *See United States v. Johnson*, 507 F.3d 793, 796 n.2 (2d Cir. 2007). According to the rule of completeness, "even though a statement may be hearsay, an 'omitted portion of [the] statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion.'" *Id.* (quoting *United States v. Castro*, 813 F.2d 571, 575–76 (2d Cir.1987)). The rule, however, does not "require the admission of portions of a statement

that are neither explanatory of nor relevant to the admitted passages." *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999).  Put differently, the rule is "is not a mechanism to bypass hearsay rules for any self-serving testimony." *United States v. Gonzalez*, 399 F. App'x 641, 645 (2d Cir. 2010).

At the outset, the Government's motion is moot insofar as it seeks to preclude Defendant from introducing prior statements made by Defendant at his proffer sessions.  Because the Court grants Defendant's motion to sever, the Government will have no basis to introduce Defendant's statements made during the proffer sessions "except in the unlikely event that the defense opens the door to such evidence." (Def. Opp. at 10.)

The Government's motion is denied insofar as the Government seeks to preclude Defendant from introducing prior statements made by Defendant at his FBI interview.  The Government identifies "precise, brief, video recorded statements—totaling about forty-two seconds of an approximately hour and fifteen-minute interview—that it intends to offer, which simply explain that the defendant agreed in advance to conduct a video call with CC-1 from inside the Embassy and that he in fact conducted that call on or about June 29, 2021." (Gov't Reply at 5 n.1.)  The statements read as follows:

> HTUT: And then the next day he told me that uh, "Phyo, I know you are in the Embassy. Let's make a video chat." And he said -- I said, okay…. [PORTION EXCISED BY GOVERNMENT]
> HTUT: So he said, try to make the video chat. And I show the Ambass- - I was gonna show the Ambassador room, but it was lock. I show him, I showed that uh I stay here and I - I stay -- I have to go out, I have to wait at the downstairs. I have to wait at the downstairs, and I even show the secretary room of -- I don't go inside. But I show this is the secretary room of the Ambassador.
> AGENT: So you sent -- you did a video call with [CC-1].
> HTUT: [CC-1], yes sir.
> AGENT: Showing inside of the Embassy.
> HTUT: Yes, yes.
> AGENT: Do you remember when that was?

HTUT: Uh I thought was -- it was on June 28 or 29.

(Gov't Mem. at 18.)   As identified above, the Government excises the following portion of Defendant's statements: "So because at that time, I already know. I can't say no to him because he told me about my family every time. He told me about my family, every time he mention [sic] about my family, he -- when he call me." (*Id.* at 18 n.2.)  The Court observes that this type of line-by-line editing is disfavored and inclines the Court to permit Defendant to introduce—for purpose of completeness—the excised portion of the above statement should the Government seek to admit it. *Compare United States v. Haddad*, 10 F.3d 1252, 1259 (7th Cir. 1993) (finding error where lower court admitted defendant's prior statement that he knew of marijuana under his bed but excluded defendant's prior statement that he did not know gun was also under the bed, because proximity of the two items "might suggest, absent more, that the defendant also knew of the gun") *with United States v. Lumiere*, 249 F. Supp. 3d 748, 758 (S.D.N.Y. 2017) (allowing government to "introduce simple historical facts about the mechanics and scope of the mismarking scheme" and precluding defendant from offering additional statements to explain why his participation in the scheme was innocent).  To the extent the Government seeks to admit Defendant's above-statement as evidence supporting the charged conspiracy, the Court will permit Defendant to admit the excised portion of the statement for completeness purposes.  The Court will reserve judgment on any other statements made during the FBI interview that the parties seek to admit.[5]  Because the Court grants Defendant's motion to sever, the Government's motion is moot insofar as the

---

[5] Defendant also seeks to admit unidentified statements to challenge the voluntariness of the FBI interview. (Def. Opp. at 9 n.2.)  The Court will reserve judgment on the admissibility of any statements Defendant attempts to admit for this purpose.

Government seeks to admit Defendant's statements during the FBI interview as evidence supporting the severed false statement counts.

With respect to statements made during the August 2 and 3, 2021 meetings with the Supervisor and Security Chief, the Court will reserve judgment on any statements that the parties seek to admit.  Because it appears the Government will admit the statements through oral testimony—and not solely by written or recorded form—it is unclear the precise contours of hearsay the Government will introduce.  As such, it is difficult for the Court to assess at this time which statements—if any—will require additional context for completeness purposes.  For example, on the one hand, a witness may testify that Defendant admitted, "I communicated about the Ambassador and the Embassy with an arms dealer who lives in Thailand who was a friend of my father's and had given my father business in Myanmar."  (*See* Gov't Mem. at 17.)  Such testimony points to "simple historical facts" that require no further context and prompt no obvious inferences such that the above hearsay could be characterized as incomplete, unfair, or misleading. *See Lumiere*, 249 F. Supp. 3d at 758.  On the other hand, a witness may testify that Defendant admitted, "I was told that a man was coming to the United States in the near future from London and organizing hit teams to attack the Ambassador, and I was instructed to contact the man at a hotel near the Myanmar embassy when the man arrived." (*See* Gov't Mem. at 17.)  Such testimony leaves the jury to fill in the blanks with an inference that is inextricably linked: Defendant admitted he was instructed to contact a hitman when the hitman arrived in the United States, *and Defendant did so*.  *See Haddad*, 10 F.3d at 1259 (finding error because lower court admitted portion of statement where defendant acknowledged the location of marijuana, which in turn allowed the jury to draw improper inference that defendant had also seen nearby gun).  Allowing the jury to hear that Defendant admitted to being so instructed while omitting the full context—that Defendant

said he did not follow those instructions—paints a misleading picture.  So too would permitting the Government to admit testimony that Defendant made a generalized confession to "participating in a conspiracy" while excluding Defendant's repeated statements that he *feigned* his participation. Accordingly, the Court reserves judgment on any statements that the parties seek to admit from the August 2 and 3, 2021 interviews.

The Court DENIES the Government's motion *in limine*.  The Government's motion is moot insofar as the Government seeks to admit Defendant's statements made during the proffer sessions. The Government's motion is also moot insofar as the Government seeks to admit Defendant's statements made during the FBI interview as evidence supporting the severed false statement counts.  To the extent the Government seeks to admit Defendant's statement to the FBI as evidence supporting the charged conspiracy, the Court will permit Defendant to admit the excised portion of the statement for completeness purposes.  The Court will reserve decision on any other statements made during the FBI interview that the parties seek to admit.  The Court will also reserve decision on any statements that the parties seek to admit from the August 2 and 3, 2021 interviews.

### C.  Communications Between Co-Conspirators About Known Dissidents

The Government intends to offer evidence during its case-in-chief of communications between the co-conspirators, including Defendant, about "multiple well-known dissidents who were targets of the Myanmar military."[6]  (Gov't Mem. at 23.)  The Government argues such

---

[6] The Government first requests the Court allow the Government to "introduce evidence that the *[D]efendant* exchanged communications with members of the charged conspiracy regarding multiple dissidents who are known to be targets [of] Myanmar's military." (Gov't Mem. at 26 (emphasis added).)  The Government later asks the Court to allow the Government to introduce "communications relating to known dissidents," and based on the examples the Government offers, it appears the Government seeks to introduce communications between the co-conspirators relating to known dissidents regardless of if those communications include Defendant.  (Gov't Reply at 12–14.) Because this Court finds the statements of co-conspirators to be admissible, *see infra*, the Court interprets the Government's motion broadly: seeking permission to introduce communications between co-conspirators regarding known dissidents.

evidence is "highly probative" and thus admissible as direct proof of the charged conspiracy.  (*Id.* at 23.)  In the alternative, the Government argues the evidence is authorized by Federal Rule of Evidence 404(b).  (*Id.* at 23.)

Defendant argues that the Government cannot offer such communications as direct evidence of the charged conspiracy because the Government "has identified nothing to suggest [Defendant] was part of any such distinct uncharged conspiracy."  (Def. Opp. at 11–12.) Defendant further questions how the communications bear any relevance "so as to be admissible pursuant to Rule 404(b)."  (*Id.* at 12.)  Defendant also contends the statements' probative value is substantially outweighed by their prejudicial impact: "[g]iven the paucity of evidence that [Defendant] knew of such plots—let alone agreed to them—this type of argument would be unfair and inflammatory."  (*Id.* at 12.)  The Government responds that "the communications, which on their face relate to the charged conspiracy to harm the Ambassador, also involve apparent threats to Dissident-1 and Dissident-2."  (Gov't Reply at 13.)  These communications about known dissidents, it follows, are "inextricably intertwined" with communications related to the charged conspiracy to harm the Ambassador.  (*Id.* at 12–13.)  The Government adds that these communications are not unduly prejudicial because they are neither "more sensational" nor more "disturbing" than those communications involving the Ambassador.  (*Id.* at 14.)

"To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).  The Second Circuit is clear that "[t]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events or to

furnish an explanation of the understanding or intent with which certain acts were performed." *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988)).  Furthermore, "evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *Gonzalez*, 110 F.3d at 942).

Even if these communications are not direct evidence of the charged conspiracy, Rule 404(b) expressly permits the introduction of evidence of other crimes for a variety of other purposes "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  Courts engage in a three-part test to determine the admissibility of evidence under Rule 404(b).  *See Huddleston v. United States*, 485 U.S. 681, 688–91 (1988).  "First, the trial court must determine whether the evidence is offered for a proper purpose, namely, a purpose other than to prove the defendant's bad character or criminal propensity."  *United States v. Colon*, 880 F.2d 650, 656 (2d Cir. 1989).  Next, the court must determine whether the proffered evidence is relevant under Rules 401 and 402.  *Id.*  Finally, "the government may introduce evidence of a defendant's prior crime . . . if the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice."  *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) (citing *United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993)).  The Second Circuit has adopted an "inclusionary approach to evaluating Rule 404(b) evidence."  *United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003).  However, "[t]his inclusionary approach does not invite the Government 'to offer, carte blanche, any prior acts of

the defendant in the same category of crime.'" *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009).

Here, the communications between Defendant, CC-1, CC-2, and CC-3 related to well-known, pro-democracy dissidents are "inextricably intertwined" with the evidence of the charged conspiracy to harm the Ambassador.[7] *Carboni*, 204 F.3d at 44.  In plotting an attack against the Ambassador, the co-conspirators also communicated about other pro-democracy dissidents, including Dissident-1 and Dissident-2.  These communications ranged from tracking dissidents' whereabouts to planning additional attacks (*see generally* Gov't Reply at Ex. A):  On June 19, 2021, CC-3 sent CC-1 a picture of the Ambassador and Dissident-1 flashing a pro-democracy hand gesture, and CC-3 followed up with a message saying, "Buy it for both."  CC-1 then forwarded the image to Defendant and then CC-2.  On June 20, 2021, CC-2 sent CC-1 eight photos, including one of the Ambassador and Dissident-1 participating together in protests in New York City.  On June 25, 2021, CC-1 asked CC-2 about the "Noodles situation"—"noodles" being Burmese slang for a "hit," (*id.* at 11)—and sent CC-2 a picture of Dissident-1 with a pro-democracy leader.  On July 1, 2021, and July 6, 2021, CC-1 sent CC-3 multiple pictures of known dissidents, including the Ambassador, Dissident-1, and Dissident-2.  On July 13, 2021, CC-1 sent CC-3 screenshots of a report submitted to the FBI, which claimed the Ambassador, Dissident-1, and Dissident-2 were "key figures operating . . . terrorist activities" in Myanmar.  Viewed together, these communications show the conspiracy to assault the Ambassador is "inextricably intertwined" with the conspiracy to assault other well-known dissidents, including Dissident-1 and Dissident-2.  As such, communications about known dissidents are properly classified as direct evidence of the charged conspiracy.  In addition, the Court does not find the probative value of these communications to be substantially outweighed by

---

[7] As set forth *infra*, the statements of Defendant's co-conspirators are admissible under Federal Rule of Evidence 801(d)(2)(E).

their prejudicial impact.  The communications here are no "more sensational" or "disturbing" than those involving the Ambassador.  *See United States v. Curley*, 639 F.3d 50 (2d Cir. 2011) (finding lower court abused its discretion where it admitted evidence that was "highly prejudicial" and made defendant look far "more violent and disturbed than he appeared from the other evidence").

The Court GRANTS the Government's motion *in limine*.  The Government is permitted to admit evidence of communications between co-conspirators about known dissidents.

### D.  Out-of-Court Statements of Co-Conspirators

The Government intends to introduce at trial communications between members of the conspiracy, including Defendant, CC-1, CC-2, CC-3, and CC-4.  (Gov't Mem. at 28.)  The Government argues the co-conspirators' Facebook messages and Defendant's statements to Embassy personnel and the FBI demonstrates a conspiracy existed between Defendant and declarants CC-1, CC-2, CC-3, and CC-4 to assault the Ambassador.  (*Id.* at 31–32.)  The Government further argues these statements were "made during the course of and in furtherance of that conspiracy."  (*Id.* at 32.)

Defendant contends the Court should not "simply admit all statements attributed to co-conspirators *en masse*."  (Def. Opp. at 14 (emphasis in original).)  Defendant also identifies a few statements that Defendant believes are "patently speculative."  (*Id.* at 14.)  For example, one message states, "some blacks from St. Louis accept fried noodle dishes."  (*Id.* at 15.)  The Government says accepting "fried noodle dishes" is "slang for a hit" (Gov't Mem. at 8–9), whereas the Defendant asserts "the reader simply cannot interpret these comments intelligently" "without more context."  (Def. Mem. at 15.)  Lastly, Defendant complains the Government "has yet to identify to the defense the real identity" of CC-2, CC-3, and CC-5.  (*Id.* at 15.)  The Government responds that it produced months ago complete versions of warrant returns from which all of the relevant co-conspirator statements are drawn, and as such, the Government asserts Defendant

"cannot credibly claim that he does not know who these co-conspirators are—their identities are in the discovery." (Gov't Reply at 8–9.) Regardless, the Government adds that it need not identify the co-conspirators by name for their statements to be admissible. (*Id.* at 9.) The Government also observes that "it is commonplace" for courts to "make general rulings as to the admissibility of categories of statements, while preserving a defendant's ability to object to the admissibility of particular statements." (*Id.* at 10.) "[F]or the avoidance of doubt," the Government identifies three categories of co-conspirator statements: "(i) communications relating to the Ambassador; (ii) communications relating to the Embassy and its personnel; and (iii) communications relating to Dissident-1 and Dissident-2." (*Id.* at 10.) Lastly, the Government argues Defendant ignores context when asserting a reader could not interpret the co-conspirators' slang: these communications, argues the Government, were "sent by the same conspirators, during the same time period, using the same coded language that they had been using to discuss hurting the Ambassador for weeks, [and] fits the broader pattern and should be admitted." (*Id.* at 12.)

Rule 801(d)(2)(E) provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit a statement pursuant to this rule, a district court must find two facts by a preponderance of the evidence: first, that a conspiracy that included the defendant and the declarant existed; and second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). A statement is made in furtherance of a conspiracy if "designed to promote or facilitate achievement of the goals of that conspiracy." *Glenn v. Bartlett*, 98 F.3d 721, 728 (2d Cir. 1996). A statement need not be made by one co-conspirator to another co-conspirator in order to be in furtherance of a conspiracy.

*United States v. Green*, 887 F.2d 25, 27–28 (1st Cir. 1989) (coconspirator's statement to shooting victim admissible against co-defendant under Rule 801(d)(2)(E)); *see United States v. Gupta*, 747 F.3d 111, 125 (2d Cir. 2014) (a statement need not be made to a member of the conspiracy to be admissible under Rule 801(d)(2)(E) because "[s]tatements designed to induce the listener's assistance with respect to the conspiracy's goals satisfy the Rule's in-furtherance requirement").

Although only co-conspirator statements made "in furtherance" of the conspiracy are admissible under Rule 801(d)(2)(E), the standard for what qualifies as a statement "in furtherance" of a conspiracy is not very restrictive.  The requirement that the challenged statement be "in furtherance of" the conspiracy is satisfied if the statement's objective is "designed to promote or facilitate achievement of the goals of the conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994).  It permits, for example, introduction of any co-conspirator statement that "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).

The Second Circuit has held that co-conspirator statements that "provide reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and cohesiveness or inform each other as to the progress or status of the conspiracy" further the ends of the conspiracy, *United States v. Desena*, 260 F.3d 150, 159 (2d Cir. 2001), as do statements "that apprise a co-conspirator of the progress of the conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987). *See United States v. Amato*, 15 F.3d 230, 234 (2d Cir. 1994) (statement apprising co-conspirator in loansharking conspiracy of status of loan was made in furtherance of the conspiracy); *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989) (statement among conspirators that defendant was

27

receiving proceeds of extortion was in furtherance of conspiracy because it informed conspirators of status of conspiracy).

Although the Government must demonstrate that the defendant and the declarant belonged to the same conspiracy, the defendant and declarant need not both be members of the charged conspiracy in order for the declarant's statement to be admissible against the defendant.  *See United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979) ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment."); *United States v. Bowe*, 221 F.3d 1183, 1193 (11th Cir. 2000) ("[T]he conspiracy that forms the basis for admitting a coconspirator's out of court statements need not be the same conspiracy for which the defendant is charged."); *see also United States v. Stratton*, 779 F.2d 820, 829 (2d Cir. 1985) ("[I]t is not necessary that the Government charge a conspiracy to take advantage of Fed. R. Evid. 801(d)(2)(E)."); *United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990) (same).

The Second Circuit has explained that, to admit a co-conspirator statement made in a separate conspiracy, the Government must demonstrate only that the defendant and the declarant are members of some conspiracy that somehow is "factually intertwined" with the charged offenses.  *See Stratton*, 779 F.2d at 829 (the Government must demonstrate that the conspiracy to which the defendant and the declarant belong "is factually intertwined with the offenses being tried") (internal quotations omitted); *see also Lyles*, 593 F.2d at 194.

Here, the Government has proffered enough information to demonstrate Defendant, CC-1, CC-2, CC-3, CC-4, and CC-5 were engaged in a conspiracy "factually intertwined" with the charged conspiracy.  *Stratton*, 779 F.2d at 829.  Defendant and CC-1 communicated on a regular basis during June and July of 2021 regarding pro-democracy dissidents, such as the Ambassador,

Dissident-1, and Dissident-2.  (*See, e.g.,* Gov't Reply at Ex. A.)  These communications were part and parcel of a broader constellation of communications between CC-1, CC-2, and CC-3, who relied in part upon information provided by Defendant about these dissidents.  These communications, though not mentioned in the Superseding Indictment, furthered the charged conspiracy to assault the Ambassador.  In other words, the charged conspiracy between Defendant and CC-1 to assault the Ambassador was part and parcel of the uncharged conspiracy between Defendant, CC-1, CC-2, CC-3, CC-4, and CC-5.  To carry out this conspiracy, Defendant's co-conspirators relied upon Defendant to provide information regarding the Embassy and its personnel, which in turn helped the co-conspirators plan an attack.  Moreover, the co-conspirators often discussed plans to attack the Ambassador in messages which also identified other pro-democracy dissidents, namely Dissident-1 and Dissident-2.  In addition, as discussed *supra*, any plans to target Dissident-1 and Dissident-2 were inextricably linked to the conspiracy to attack the Ambassador.  Indeed, the conspiracy to assault the Ambassador and the conspiracy to assault Dissident-1 and Dissident-2 are best seen as one and the same: a conspiracy to attack well-known pro-democracy dissidents.

Defendant does not appear to contest that Defendant, CC-1, CC-2, CC-3, CC-4, and CC-5 were collectively engaged in a conspiracy to assault well-known pro-democracy dissidents. Instead, Defendant takes issue with the Government offering statements for the Court to admit "*en masse*." (Def. Opp. at 14.)  The Court is not persuaded.  As the Government correctly points out, "it is commonplace for courts considering motions *in limine* to make general rulings as to the admissibility of categories of statements, while preserving a defendant's ability to object to the admissibility of particular statements." (Gov't Reply at 10.)  *See United States v. Adelekan*, 567 F. Supp. 3d 459, 468 (S.D.N.Y. 2021) (admitting categories of co-conspirator statements on a

conditional basis); *see also United States v. Fallas*, No. 09 CR. 342 (LAP), 2010 WL 3468605, at

*4 (S.D.N.Y. Aug. 19, 2010) ("In the Second Circuit, statements proffered into evidence as co-

conspirator statements are admitted on a conditional basis; if the Government is unable to prove

the prerequisites for admission under Federal Rule of Evidence 801(d)(2)(E) at the close of its

evidence, then the jury will either be instructed to disregard the statements or, if the statements are

so prejudicial that a limiting instruction will not cure the harm, the court will declare a mistrial.")

(citing *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir.1993)).

Next, Defendant argues the statements are "patently speculative" and lack context; for

example, Defendant argues the Government has not explained how "cryptic texts" like "some

blacks from St. Louis accept fried noodle dishes" are "in furtherance of the charged conspiracy (or

any related conspiracy)." (Def. Opp. at 14–15.) The Government, however, has explained the

context of the coded language it plans to offer. *See United States v. Olivo*, 664 F. App'x 77, 80

(2d Cir. 2016) (affirming lower court's decision to admit co-conspirator statements where the

"coded" statements "plainly reference[d] drug trafficking"). The term "fried noodles," for instance,

is "Burmese slang for a 'hit,'" and this meaning is confirmed by "multiple messages amongst co-

conspirators using the term in the context of discussions about harming the Ambassador." (Gov't

Reply at 11.) A June 26, 2021 conversation between CC-1 and CC-2 is instructive:

> June 26, 2021, 9:26 a.m.: CC-1 messages CC-2: "How much for a
> bag of Noodles"?
> June 26, 2021, 9:26 a.m.: CC-2 messages CC-1: "Brother, they said
> that it is easier to ambush a person outdoors but to pull a person out
> of an Embassy needs some thinking. It might be easier to do it when
> the person is on the street but they are a bit afraid to go inside the
> embassy and pull the person out…."
> June 26, 2021, 1 p.m.: CC-1 responds to CC-2: "Do it outside."

(Gov't Reply at Ex. A.)  Defendant also objects to communications referencing "Chinatown" as speculative.  But the Government again cites to a series of messages which "closely tie these ['Chinatown' references] to the plot to harm the Ambassador" (*Id.* at 11):

> June 16, 2021, 8:30 a.m.: CC-1 messaged CC-2: "Are you still going to Chinatown?" About two minutes later, CC-1 sent CC-2 an image of the Ambassador raising three fingers in protest, followed by an image of men in military uniforms with rifles.
> June 18, 2021, 7:03 p.m.: CC-1 asked CC-2: "What is the Chinatown situation?" About three minutes later, CC-2 responded: "I met with the broker in Chinatown and will inquire about the price and other matters next week. To be sure, we need to wait and ask. The Chinese lady at the store mentioned she will ask her friend and introduce us. I asked about other matters, but I haven't spoken to them directly."
> June 18, 2021, 7:07 p.m.: CC-1 messaged CC-3: "Met with the broker from Chinatown they are going to let me know the price and the case next week. To be sure I patiently waited and asked. The Chinese lady from the store asked her friend and set it up for me. I just gave another reason but not the real one yet." About a minute later, CC-1 sent CC-3 the same images of the Ambassador followed by men with rifles that CC-1 had sent to CC-2 two days earlier.
> June 19, 2021, 5:14 a.m.: CC-3 sent CC-1 a picture of the Ambassador and Dissident-1, sitting in the Embassy raising three fingers, followed quickly by a message saying: "Buy it for both."

(*Id.* at Ex. A.)  Seen in context, the references to "Chinatown"—whether coded or not—are made in the context of messages which "clearly relate to, and were made in furtherance of, the conspiracy." (*Id.* at 11.)

Lastly, Defendant argues the Government has not yet revealed the identities of CC-2, CC-3, and CC-5.  (Def. Opp. at 15.)  The Government responds that it has produced warrant returns for the full Facebook accounts of CC-2 and CC-3.  (Gov't Reply at 9.)  The Government also responds that it produced a picture of a travel authorization for CC-5, which Defendant received from CC-1.  (*Id.* at 9.)  Regardless, it is not necessary here for the Government to identify the co-conspirators by name for the statements to be admissible.  *See United States v. Boothe*, 994 F.2d 63, 69 (2d Cir. 1993) (citing *United States v. Cruz*, 910 F.2d 1072, 1081 n.10 (3d Cir. 1990) ("Unidentifiability may be important

in some situations, but when the statement itself and the surrounding circumstances provide sufficient evidence of reliability, unidentifiability will not be particularly important.")).

The Court GRANTS the Government's motion *in limine*.  The Government is permitted to admit three categories of co-conspirator statements: (i) communications relating to the Ambassador; (ii) communications relating to the Embassy and its personnel; and (iii) communications relating to Dissident-1 and Dissident-2.

### E.  Evidence Unconnected to Guilt

The Government lastly moves to preclude the Defendant from offering evidence or argument concerning "punishment, his immigration status, any possible immigration consequences that may follow a conviction, or any similar factor."  (Gov't Mem. at 32.)  In sum, the Government seeks to preclude the Defendant from introducing any information that does not bear upon Defendant's guilt.  (*Id.* at 32.)  Defendant concedes "there is no question that it would be inappropriate to submit to the jury information concerning punishment" and likewise that "it is improper to discuss with the jury how a conviction might impact an individual's immigration status."  (Def. Opp. at 17.)  Defendant only intends to introduce evidence that Defendant "entered the United States legally and applied for asylum."  (*Id.* at 18.)  Defendant argues "the fact of his asylum application constitutes direct evidence of [Defendant's] motivations" to feign participation in the conspiracy.  (*Id.* at 18.)  The Government responds that "Defendant's representation that he applied for asylum, a year before the coup, out of fear of the military is entirely self-serving."  (Gov't Reply at 15.)  The Government questions "how [the application] provides relevant evidence as to whether [Defendant] would later join a plot to harm the Ambassador," and the Government

also observes that Defendant "fails to explain how he intends to introduce evidence of his asylum application." (*Id.* at 15.)

The Government essentially requests that the Defendant adhere to Rule 103(d) of the Federal Rules of Evidence, which states in relevant part that "the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means." It is well established that when, as here, a jury does not have a sentencing function, jurors are not to be informed of the consequences of their verdict because "[i]nformation regarding the consequences of a verdict is [ ] irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Shannon v. United States*, 512 U.S. 573, 579 (1994). As both the *Shannon* Court and the Second Circuit suggest, there may be circumstances where it is within the Court's discretion to inform the jury of applicable punishments. *Id.* at 588 ("If, for example, a witness or prosecutor states in the presence of the jury that a particular defendant would 'go free' if found [not guilty], it may be necessary for the district court to intervene with an instruction to counter such a misstatement."); *United States v. Polouizzi*, 564 F.3d 142, 161–163 (2d Cir. 2009). In this case, however, there is no basis upon which the Defendant would be allowed to introduce into evidence or refer to any punishment that may follow a conviction of the counts charged, *United States v. Del Rosario*, No. S1 12 Cr. 81(KBF), 2012 WL 2354245, at *2 (S.D.N.Y. June 14, 2012) ("The only possible basis upon which defendant could seek to introduce evidence of punishment (including deportation) is to focus the jury on something other than whether the elements of the crime charged have been proven beyond a reasonable doubt. The law does not favor or support such an attempt to choreograph jury nullification."), nor does Defendant intend to (Def. Opp. at 17–18). *See United States v. Adelekan*,

567 F. Supp. 3d 459, 471 (S.D.N.Y. 2021) (noting that parties agreed it would be "improper" for defendant to introduce "potential immigration consequences of a guilty verdict").

Here, as stated above, Defendant does not intend to offer evidence unrelated to the question of Defendant's guilt, such as the immigration consequences of a conviction. (Def. Opp. at 17–18.) To the extent he does intend to do so, such a proffer would be improper. *See, e.g., United States v. Del Rosario*, 2012 WL 2354245, at *2. Defendant instead intends to offer evidence that he applied for asylum upon entering the United States. (Def. Opp. at 17–18.) The fact of Defendant's asylum application sheds light on Defendant's motive—or lack thereof—for joining the charged conspiracy. (*Id.* at 17–18.) So long as Defendant lays the proper foundation and provides a non-hearsay basis, this Court will not preclude Defendant from admitting such evidence.

The Court GRANTS in part and DENIES in part the Government's motion *in limine*. Defendant is precluded from introducing evidence or argument unrelated to the question of Defendant's guilt. Defendant, however, is permitted to admit evidence of Defendant's asylum application, so long as Defendant lays the proper foundation and provides a non-hearsay basis for doing so.

## CONCLUSION

Defendant's motion to sever is GRANTED. Trial on the conspiracy count will proceed as scheduled, with jury selection beginning on July 11, 2023. The Court will schedule trial on the false statement counts for a later date.

The Government's motions in limine are GRANTED in part and DENIED in part:

(1) **<u>Duress:</u>** Defendant shall inform the Court in writing twenty-four hours prior to jury selection that he intends to offer evidence or argument on a duress defense, and the Court

will conduct a hearing outside the presence of the jury to determine whether Defendant has made the requisite showing.

(2) **Defendant's Prior Statements:** The Government's motion is moot insofar as the Government seeks to admit Defendant's statements made during the proffer sessions. The Government's motion is also moot insofar as the Government seeks to admit Defendant's statements made during the FBI interview as evidence supporting the severed false statement counts. To the extent the Government seeks to admit Defendant's statement to the FBI as evidence supporting the charged conspiracy, the Court will permit Defendant to admit the excised portion of the statement for completeness purposes. The Court will reserve judgment on any other statements made during the FBI interview that the parties seek to admit. The Court will also reserve judgment on any statements that the parties seek to admit from the August 2 and 3, 2021 interviews.

(3) **Communications Between Co-Conspirators About Known Dissidents:** The Government is permitted to admit evidence of communications between co-conspirators about known dissidents.

(4) **Out-of-Court Statements of Co-Conspirators:** The Government is permitted to admit three categories of co-conspirator statements: (i) communications relating to the Ambassador; (ii) communications relating to the Embassy and its personnel; and (iii) communications relating to Dissident-1 and Dissident-2.

(5) **Evidence Unconnected to Guilt:** Defendant is precluded from introducing evidence or argument unrelated to the question of Defendant's guilt. Defendant, however, is permitted

to admit evidence of Defendant's asylum application, so long as Defendant lays the proper foundation and provides a non-hearsay basis for doing so.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 45 and 46.

Dated:   July 7, 2023                                    SO ORDERED:
         White Plains, New York

_____
NELSON S. ROMÁN
United States District Judge

36